United States District Court
Southern District of Texas
**ENTERED**
December 08, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GRAND FAMOUS SHIPPING LTD., *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:18-CV-04678 |
| | § | |
| THE PORT OF HOUSTON AUTHORITY, *et al.*, | § | |
| | § | |
| Claimants. | § | |

**MEMORANDUM & ORDER**

This limitation of liability action arises from the allision of the M/V Yochow with the OSG 243 Barge and A-Dock at the TPC Terminal on June 13, 2018. Limitation Petitioners are Grand Famous Shipping Ltd., owner of the M/V Yochow, and Beikun Shipping (Tianjin) Co., Ltd., manager of the M/V Yochow. Claimants include OSG 243 LLC, owner of the OSG 243 Barge; OSG Ship Management Inc., manager of the OSG 243 Barge; TPC Group LLC, lessee of A-Dock; Port of Houston Authority ("POHA"), lessor of A-Dock; and Wilbert Cormier, personal injury claimant. The China Navigation Company Pte., Ltd. ("CNCo") was an intermediary charterer of the Yochow.

On November 15, 2021, the Court heard CNCo's Motion for Summary Judgment (Doc. 215). At the hearing, the Court ruled from the bench. The Court provides this Memorandum and Order to further document its rulings and reasoning.

## I. BACKGROUND

While the Yochow was being built, CNCo entered into a "Time Charter Party Agreement" for the vessel with Grand Famous. (Doc. 215 at 4.) CNCo's dealings with Grand Famous were conducted at arm's length through an intermediary shipbroker (Taiwan Wallem Transportation Co., Ltd.). (*Id.*) The Time Charter Agreement was "based on a New York Produce Exchange ('NYPE') form appended by several rider and BIMCO clauses." (*Id.* at 5.) The NYPE form "is the most widely used standard time charter party in the dry cargo sector of the industry." BIMCO, ASBA & SMF, *NYPE 2015 Time Charter Party Explanatory Notes* (last revised Oct. 15, 2015), available at https://www.smf.com.sg/wp-content/uploads/2018/11/22-document-nype-2015-explanatory-notes.pdf. CNCo could engage the Yochow to carry cargo under the Time Charter Agreement, but Grand Famous retained possession and control over the vessel. (Doc. 215 at 4.)

Grand Famous, in turn, entered into a Ship Management Agreement with Beikun Shipping Tianjin Co. Ltd. ("Beikun"). (*Id.*) Beikun undertook substantial management responsibilities for the Yochow under that agreement, including, but not limited to: (1) assuming the duties required by the ISM Code, including establishing, implementing, and maintaining a Safety Management System (SMS); (2) providing routine maintenance and arranging repairs; (3) manning the vessel and selecting and training crew members; (4) educating crewmembers on the SMS; (5) crafting safety and pollution procedures; and (6) applying to Classification Societies for SMS certification and review. (*Id.* at 3–4.) "Beikun held a valid Document of Compliance establishing that its SMS complied with the ISM Code." (*Id.* at 4 (internal citations omitted).)

The allision occurred in the early morning hours of June 13, 2018. While navigating the Houston Ship Channel, Captain William Ewing ordered Helmsman Nan Win to turn the Yochow to starboard. (Doc. 233 at 6.) The helmsman, apparently, "was seriously fatigued." (*Id.*) Perhaps

due to the "lack of a fatigue management program and a lack of enforcement of international regulations related to work/rest hours" on the vessel, the helmsman turned to port. (*Id.* at 6–7.) The helmsman then tried to correct his error, but the damage was already done. (*Id.*) The Yochow struck the Barge, and the momentum from that allision pushed the Barge into A-Dock. (*Id.*)

At the time of the allision, CNCo was sub-chartering the Yochow to Daiichi for a trip to the Gulf Coast. (*Id.* at 8.) Under this sub-charter, Daiichi directed the Yochow to Houston to discharge its cargo. (*Id.*) Daiichi also engaged a Houston ship agent—General Steamship Corporation—to act on its behalf for the Houston call of the vessel. (*Id.*)

## II. STANDARD OF REVIEW

Summary judgment under Rule 56 "is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting FED. R. CIV. P. 56(c)). A genuine issue as to a material fact arises "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must draw all "reasonable inferences . . . in favor of the nonmoving party, but the nonmoving party 'cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.' " *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007) (quoting *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 343 (5th Cir. 2007)). "[T]he movant bears the initial responsibility of demonstrating the absence of a genuine issue of material fact with respect to those issues on which the movant bears the burden of proof at trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718 (5th Cir. 1995). "For any matter on which the non-movant would bear the burden of proof at trial, however, the movant may merely point to the

absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Id.* at 718–19. "When deciding a motion for summary judgment prior to a bench trial," the district court has limited additional "discretion to decide that the same evidence, presented to him or her as a trier of fact in a plenary trial, could not possibly lead to a different result." *Jones v. United States*, 936 F.3d 318, 321–22 (5th Cir. 2019).

## III. ANALYSIS

CNCo raises three main arguments: (1) TPC's negligence claims fail because CNCo was not the Yochow's de facto owner; (2) TPC's negligence claims fail because CNCo was not an independently negligent time charterer; and (3) POHA's breach-of-contract claims fail because CNCo was not a party to any contract with POHA.[1] For the reasons set out below, the Court **GRANTS** CNCo's Motion for Summary Judgment.

### *A. TPC's Negligence Claims*

TPC's negligence claims turn on the type of charter arrangement that governed the Yochow's trip to Houston. Maritime law recognizes three types of charter parties: the voyage charter, the time charter, and the demise or bareboat charter. *In re Dann Ocean Towing, Inc.*, 2018 WL 901716, at *2 (D.N.J. Feb. 15, 2018) ("*Dann Ocean Towing*"). As explained in *Dougherty v. Navigazione San Paolo, S.P.A. Medafrica Line*:

> In a voyage charter the ship is engaged to carry a full cargo on a single voyage. The owner retains all control over the vessel. In a time charter the ship's carrying capacity is taken by the charterer for a fixed time for the carriage of goods on as many voyages as can fit into the charter period. Again, the owner retains all control

[1] Other parties also asserted negligence claims against CNCo, but TPC was the only one to file a substantive Response to CNCo's Motion. Consequently, the Court will refer to the negligence claims against CNCo as "TPC's negligence claims."

> for management and navigation. In a demise or bareboat charter, the charterer takes over full control of the ship and becomes the owner *pro hac vice*. The [demise] charterer thus assumes control of management and navigation. *See generally*, G. GILMORE AND C. BLACK, THE LAW OF ADMIRALTY 193–94 (2d ed. 1975).

622 F. Supp. 1, 3–4 (E.D.Pa. 1984) (some internal citations omitted).

"Under traditional admiralty principles an injured [party] cannot sue a time charterer unless the[y] can show either the time charterer had enough control of the vessel to render it the owner *pro hac vice*, or the time charterer was actively negligent." *Alexander v. United States*, 63 F.3d 820, 822 (9th Cir. 1995) (internal citations omitted); *see* THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 10–12 at 404 (1987) ("In a non-demise charter, the charterer is normally not liable for injuries to crew members for unseaworthiness or operating negligence. Where, however, the charterer is actively negligent or undertakes operating functions on the vessel, he will be liable for injuries resulting from [his] own acts."). CNCo entered into a time charter agreement with Grand Famous for the Yochow. Thus, CNCo could theoretically be liable for negligence under two theories: (1) by retaining sufficient control to act as a negligent owner *pro hac vice*; or (2) by acting as an independently negligent time charterer. Ultimately, however, neither theory provides for liability in this case.

1. De Facto Ownership

"[C]ontrol over the vessel determines whether a charter is a time charter or a demise or bareboat charter." *Dann Ocean Towing*, 2018 WL 901716 at *3. "[I]f the owner retains control over the vessel, merely carrying the goods furnished or designated by the charter, the charter is not a demise; if control of the vessel itself is surrendered to the charterer," however, then the charter is essentially a demise. *Dougherty*, 622 F. Supp. at 3–4 (internal citations omitted). Control over the vessel can be contractual or practical. Still, "a charter [agreement] that explicitly states that the

vessel's owner 'retains complete and exclusive possession and control . . .' strongly evinces that a time charterer is not an owner *pro hac vice*." *Gale-Ebanks v. Chesapeake Crewing, LLC*, 525 F. Supp. 3d 620, 626 (D. Md. 2021) (quoting *Hodnett v. United States*, 2003 WL 22764581, at *2 (E.D. Va. Aug. 11, 2003)). Courts are generally "reluctant to determine that a time charterer has operational control over a vessel, which would render it an owner *pro hac vice*." *Id.*

*Dann Ocean Towing*, a 2018 case from the District of New Jersey, is instructive on the issue of de facto ownership. There, the district court began with the parties' contractual relationship. The court recognized that time charters typically spring from a standard written agreement, which includes "provisions regarding which party is responsible for the safe management of the vessel, the shipboard personnel, the duty to maintain the vessel, the duration of the time charter, the owner's duties versus the charterer's duties, and the terms of payment." *Dann Ocean Towing*, 2018 WL 901716 at *4. In *Dann Ocean Towing*, however, the parties' agreement "was never reduced to writing, . . . was for an unspecified duration, and . . . [contained] terms based on the testimony" of people on both sides of the dispute. *Id.* Because the parties did not memorialize their agreement and disagreed as to its terms, the court concluded that the nature of the charter relationship was uncertain. *Id.* Next, the court analyzed the charterer's practical control over the vessel. Several indicia of control suggested that the charterer exceeded the traditional role of a time charterer. The charterer's use "could be found akin to how it used its own fleet," as the legal owner of the ship "only checked in once a day with the [vessel's] crew, and [the crew] were otherwise managed by [the charterer.]" *Id.* at *5. The charterer also controlled the vessel's "every movement on the date of the accident" and made the final decision to deploy the vessel "during a flood tide." *Id.* at *4. This practical control over the vessel, in conjunction with

the parties' uncertain contractual arrangement, led the court to find a genuine issue of material fact as to whether the charterer was the vessel's de facto owner. *Id.* at *6.

Here, TPC marshals several pieces of evidence to support its contention that CNCo was the Yochow's de facto owner, including: (1) CNCo renamed the vessel and painted its funnel with the "Swire logo;" (2) CNCo equipped the Yochow with software to monitor the vessel's movements and receive reports from her crew; (3) Lloyd's Register List of Ship Owners & Managers listed CNCo as the "manager" of the vessel; (4) CNCo listed the vessel as one that it "operated" in a 2016 Sustainability Report; and (5) CNCo managed and maintained its own SMS on other vessels in its fleet. TPC's evidence, however, does not raise a genuine issue of material fact concerning CNCo's limited role as the Yochow's time charterer.

Unlike the uncertain oral arrangement in *Dann Ocean Towing*, the written contract between CNCo and Grand Famous explicitly provides that CNCo will serve as the Yochow's time charterer. The contract is called a "Time Charter Party Agreement," is memorialized in writing, and is "based on a New York Produce Exchange ('NYPE') form[,] . . . which is the most widely used standard form charter party for chartering vessels to transport dry cargoes." (Doc. 215 at 5.) The Time Charter Agreement also states that "Grand Famous [is] responsible for the seaworthiness of the Vessel, her safe navigation, preparing and implementing SMS procedures, and the negligence by the crew, among other things." (Doc. 237 at 6.) Furthermore, the Time Charter Agreement deprives CNCo of any operational control over the Yochow and provides that nothing therein "is to be construed as a demise of the vessel to the Time Charterers." (Doc. 215 at 6.) To wit, the Time Charter Agreement states that "[t]he Owners shall remain responsible for the navigation of the vessel, acts of pilots and tug boats, insurance, crew, and all other similar matters, same as when trading for their own account." (*Id.*) And while the parties could have changed the assignment of

control by custom, there is no evidence of that happening here. Thus, the Time Charter Agreement indicates that CNCo was merely the Yochow's time charterer.

The Fifth Circuit arrived at a similar conclusion in its unpublished decision in *Barron v. BP America Production Co.*, 590 F. App'x 294 (5th Cir. 2014). In *Barron*, the agreement at issue stated that the charter should not be construed as a demise and that the owner "shall at all times remain responsible for the navigation of the vessel, acts of pilots, tug vessels, crew, and all other similar matters as if trading for its own account." *Id.* at 296. Because the contract language "unambiguously establishe[d] that [the charter] was not a demise and that the vessel owner maintained responsibility for the vessel," the Fifth Circuit concluded that the charterer was a simple time charterer. *Id.* The Time Charter Agreement here contains identical language; an identical result should follow. *See Weeks Marine, Inc. v. Hanjin Shipping*, 2005 WL 1638148, at *3 (D.N.J. July 12, 2005) (finding that a charterer that executed a standard agreement based on the New York Produce Exchange form was a traditional time charterer and not a de facto owner).

CNCo also did not obtain sufficient practical control over the Yochow to overcome the language of the Time Charter Agreement. CNCo did not direct the navigation of the Yochow or specify procedures for her crew. Indeed, CNCo "had no personnel aboard the vessel, and at all material times, the vessel was owned by Grand Famous and managed by Beikun under the Ship Management Agreement." (Doc. 215 at 10.) And TPC's litany of allegedly countervailing evidence is immaterial. The fact that CNCo renamed the vessel and painted its funnel with the "Swire logo" does not indicate that CNCo had practical control; the outward appearance of the Yochow had no bearing on CNCo's practical control over the vessel. What's more, installing tracking software to monitor the Yochow's movements and receive reports is consistent with CNCo's role as time charterer: CNCo had to pay for the vessel's fuel, so it made sense for CNCo

to track her course. (Doc. 237 at 4 n.2.) The listing of CNCo as the "manager" of the Yochow in Lloyd's Register List of Ship Owners & Managers is also beside the point. Lloyd's Register is an "independent entity and stranger to CNCo," and the degree of control that CNCo exercised over the Yochow does not turn on the perception of an unrelated third party. (Doc. 237 at 4.) As for CNCo's decision to list the Yochow as an "operated" vessel in its 2016 Sustainability Report, CNCo notes that the vessels that it owned or managed were listed as "managed" or "owned." (Doc. 237 at 4 n.4.) The "operated" tag merely denoted that CNCo was the vessel's commercial operator. (*Id.*) Furthermore, a one-word descriptor in a 2016 Sustainability Report has no bearing on CNCo's practical control over the vessel at the time of the allision. Finally, the fact that CNCo maintained its own SMS on other vessels says nothing about CNCo's control over the Yochow. If anything, that disparity suggests that CNCo treated the Yochow differently from the other vessels in its fleet, which militates in favor of a time-charterer relationship.

Writ large, then, there is no genuine issue of material fact as to whether CNCo acted as the Yochow's de facto owner: it did not. The Time Charter Agreement reserves control for Grand Famous and relegates CNCo to the role of a time charterer. Moreover, CNCo did not obtain practical control over the Yochow, as no evidence suggests that CNCo directed the operations of the vessel or meddled in her procedures. Consequently, the Court rejects TPC's theory that CNCo was the Yochow's de facto owner.

2. Independent Negligence

Under a traditional time charter, the vessel owner retains "primary possession and control" over the ship. *Forrester v. Ocean Marine Indem. Co.*, 11 F.3d 1213, 1215 (5th Cir. 1993). The time charterer "does not control the details of vessel operation required to reach [the ship's] destinations." *Id.* Thus, a time charterer generally "assumes no liability for negligence of the crew

or unseaworthiness of the vessel absent a showing that the parties to the charter intended otherwise." *Mallard v. Aluminum Co. of Canada*, 634 F.2d 236, 242 n.5 (5th Cir. 1981). Nevertheless, a time charterer does retain a "hybrid duty arising from tort and contract law to exercise the control the charter affords it over the timing, route, and cargo of a vessel's journey in a reasonably prudent manner." *Hodgen v. Forest Oil Corp.*, 87 F.3d 1512, 1517 (5th Cir. 1996), *overruled on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine*, LLC, 589 F.3d 778 (5th Cir. 2009). As a result, "the time charterer's duty to persons or entities not parties to the charter does not stem solely from the charter itself, which is a contract, but must also spring from independent principles of tort law." *Id.* at 1519.

*Graham v. Milky Way Barge* reveals how a time charterer can be held liable for independent negligence pursuant to this hybrid duty. 824 F.2d 376 (5th Cir. 1987). In *Graham*, Chevron time-chartered a vessel to service its equipment in the Gulf of Mexico. *Id.* at 378. Chevron also transmitted weather updates, dispatched the vessel into unsheltered waters, and ordered the "lift barge" operation to go forward despite inclement weather. *Id.* at 388. The vessel capsized in stormy seas. *Id.* at 378. The crew sued Chevron. *Id.* at 378. At trial, Chevron contended that, as a time charterer, it had "no liability for the unseaworthiness of the chartered vessel or the negligence of its crew." *Id.* at 388. The district court, however, found that Chevron was independently negligent. *Id.* The Fifth Circuit recognized that while "it may be unusual for a time charterer to be held liable for an incident concerning the vessel under charter," Chevron's actions directly contributed to the vessel's capsizing. *Id.* Consequently, the Fifth Circuit refused to disturb the district court's finding that Chevron was independently negligent as the vessel's time charterer. *Id.*

Unlike in *Graham*, however, TPC points to no evidence to suggest that CNCo negligently discharged its time charterer duties and directly contributed to the allision. TPC does not argue—

and the evidence does not show—that CNCo was negligent in choosing the Yochow's cargo, its route, its general mission, or the timing of its assignment. Indeed, CNCo sub-time-chartered the Yochow to Daiichi; it had no say over the Yochow's cargo, route, general mission, or timing. What's more, nothing suggests that the parties varied "the traditional assignment of control by contract or custom." *Hodgen*, 87 F.3d at 1520. Still, TPC argues that CNCo was independently negligent for chartering the Yochow without vetting Grand Famous' finances or the vessel's safety protocols. (Doc. 233 at 9–10.)

Whether a time charterer can be held liable for negligent vetting appears to be a matter of first impression in the Fifth Circuit. TPC, for its part, extrapolates from Texas state law, which provides that " '[a] person employing an independent contractor,' like a person employing an employee, 'is required to use ordinary care in hiring the contractor.' " *London v. Gums*, 2014 WL 546914, at *11 (S.D. Tex. Feb. 10, 2014) (quoting *Mireles v. Ashley*, 201 S.W.3d 779, 782 (Tex. App.-Amarillo 2006, no pet.)). TPC therefore concludes that CNCo had a duty to investigate the fitness of the vessel and its owner. But Texas law does not govern this federal admiralty dispute. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 483 (2008) (noting that "maritime law remains federal common law"). Thus, CNCo correctly notes that TPC cannot "point to a single case supporting the claim that CNCo, as time charterer, owed a specific duty to vet its counterparty[.]" (Doc. 237 at 7.)

In a vacuum, there are some cogent reasons to consider imposing a duty to vet on a time charterer. "In admiralty, the particular duty required under any given circumstance can be gleaned from statute, custom, or the demands of reasonableness and prudence." *In re Frescati Shipping Co., Ltd.*, 718 F.3d 184, 211 (3d Cir. 2013) (internal citations omitted). And parties might expect a prudent time charterer to investigate the chartered vessel. Indeed, TPC's expert (Captain Joseph

Bridges) suggests that "in [his] experience as a vessel time charterer, [he] would make a point of knowing what the technical manager's capabilities were, including inspecting the vessel and thoroughly reviewing the vessel's SMS." (Doc. 233-7 at 5.) Captain Bridges further adds that "[b]efore contracting with an owner, [he] would have looked into the owner and the technical manager to assess the finances of the companies to ensure they could fulfill the needs of the contract, including placing insurance, handling claims, and other necessary operations provided by the terms of the agreement." (*Id.*) Consequently, Captain Bridges posits that it is his "opinion that based on custom in the industry, [CNCo] fell well below the standard of care" by failing to vet Grand Famous and the Yochow. (*Id.* at 3.)

The concept of liability for inadequate vetting is also not foreign to maritime law. For instance, in *Smolnikar v. Royal Caribbean Cruises Ltd.*, the district court held that a vessel owner—Royal Caribbean—could be liable for its failure to employ a competent independent contractor where the plaintiff could show that: " '(1) the contractor was incompetent or unfit to perform the work; (2) the employer knew or reasonably should have known of the particular incompetence or unfitness; and (3) the incompetence or unfitness was a proximate cause of the plaintiffs injury.' " 787 F. Supp. 2d 1308, 1318 (S.D. Fla. 2011) (quoting *Davies v. Commercial Metals Co.*, 46 So.3d 71, 73–74 (Fla. 5th D.C.A. 2010)). Ultimately, the vessel owner's duty in that case was to "diligently inquire[]" into its counterparty's "fitness." *Id.* at 1318–19. So TPC's argument goes, CNCo owed a duty to diligently inquire into Grand Famous and the Yochow.

But the Court is not writing on a blank slate. In *Dann Ocean Towing*, which TPC relies upon in its papers, the district court explicitly rejected a duty to vet for time charterers: "under a true time charter, a charterer has no liability for the chartered vessel's acts, and it correspondingly has no duty to discover the chartered vessel's safety procedures or potential for creating hazards."

2018 WL 901716 at *5. The Court is loath to create a split of authority on this issue, leaving time charterers uncertain as to the true scope of their duties.

What's more, Fifth Circuit precedent militates in favor of circumscribed time-charterer liability. For example, *Hodgen* limits the reach of independent time charterer liability as follows:

> *Graham*, *Kerr–McGee*, *P & E*, and *Randall* establish that the traditional spheres of activity in which a time charterer exercises control and thus owes a duty include choosing the vessel's cargo, route, and general mission, as well as the specific time in which the vessel will perform its assignment. . . . *Brown* makes clear that the parties may vary the traditional assignment of control by contract or custom. . . . [And] *Kerr–McGee* illustrates that unless the parties have so varied the traditional allocation of responsibility, a time charterer owes no duty beyond these spheres.

87 F.3d at 1520. Per *Hodgen*, then, unless the parties vary the traditional assignment of control by contract or custom, a time charterer only owes duties in traditional spheres of activity. *Id.*; *see Chisholm v. Maryland Inland Transportation Co.*, 2000 WL 64492, at *3 (E.D. La. Jan. 25, 2000) (applying the rules from *Hodgen* and holding that where the plaintiff could not show that the time charterer "was acting in one of the traditional spheres of a time charterer's activity," the time charterer could not be liable as a matter of law). TPC cannot point to a single case that suggests that a time charterer owes a duty to vet. Consequently, the duty to vet must not fall in a "traditional sphere" of time-charterer liability. Applying the logic from *Hodgen*, if CNCo has no duties beyond the traditional spheres of activity, and vetting does not fall within a traditional sphere, then CNCo has no duty to vet.[2]

---

[2] TPC stated at the hearing that Captain Bridges' statements create a genuine issue of material fact regarding the existence of a duty to vet. But the existence and scope of a duty is a question of law. *Contango Operators, Inc. v. United States*, 9 F. Supp. 3d 735, 741 (S.D. Tex. 2014), *aff'd sub nom. Contango Operators, Inc. v. Weeks Marine, Inc.*, 613 F. App'x 281 (5th Cir. 2015); *Theriot v. United States*, 245 F.3d 388, 400 (5th Cir. 1998). The Court's analysis here indicates that there is no such duty. Thus, Captain Bridges' opinion does not create a genuine issue of material fact that bars summary judgment.

The Ninth Circuit adopted a similar stance in *Alexander v. United States*, 63 F.3d 820 (9th Cir. 1995). In that case, the plaintiff argued that the time charterer—there, the government—"was negligent in selecting a contractor without financial responsibility." *Id.* at 823 (cleaned up). The Ninth Circuit, however, concluded that the plaintiff could not show that the time charterer "owed him a duty to hire a financially responsible contractor." *Id.* at 824. The court rejected this theory because the plaintiff cited only one case that detailed such a duty (and that case was later abrogated). *Id.* at 823. *Alexander*, then, indicates two things. First, there is no duty for time charterers to vet their counterparties' financial stability. And second, courts generally refuse to impose a duty on a time charterer where no other court has previously recognized such a duty. TPC cannot direct the Court to a single case that imposes a duty to vet on a time charterer. As in *Alexander*, this Court will not craft such a duty out of whole cloth.

In addition, the Fifth Circuit has maintained that "the traditional allocation of duties between employer/platform owner, time charterer, and vessel owner places liability for harm on the party that is most directly responsible for the dangerous condition that caused the harm." *Moore v. Phillips Petroleum Co.*, 912 F.2d 789, 792 (5th Cir. 1990). Here, where a navigational error seems to have caused the allision, a time charterer with no contractual or practical control over the crew is not the most directly responsible party.

Based on the language in *Dann Ocean Towing* and the cut and thrust of Fifth Circuit precedent, the Court elects not to impose a duty on a time charterer to vet its counterparty's financial stability or safety protocols. As has been recognized time and again, a time charterer's duties are limited to traditional spheres of activity (unless the parties expand those duties). Consequently, the Court rejects TPC's theory that CNCo was independently negligent for failing

to vet Grand Famous and the Yochow.[3] And because CNCo also did not serve as the Yochow's de facto owner, there is no genuine issue of material fact on TPC's negligence claims and CNCo is entitled to judgment as a matter of law. Consequently, the Court **GRANTS** CNCo's Motion for Summary Judgment on the negligence claims asserted against it.[4]

### *B. POHA's Claims against CNCo*

CNCo also moves for summary judgment on POHA's breach-of-contract claims. At the hearing, POHA conceded these claims. Consequently, the Court **GRANTS** summary judgment for CNCo on POHA's breach-of-contract claims.

## IV. CONCLUSION

For the reasons described above and on the record at the December 7, 2021 hearing, the Court **GRANTS** CNCo's Motion for Summary Judgment (Doc. 215).

**IT IS SO ORDERED.**

---

[3] TPC's argument is further diminished by the fact that Grand Famous contracted with Beikun to manage the Yochow. Grand Famous's agreement with Beikun allocated responsibility to Beikun "to ensure that the ship was properly crewed and had an appropriate [SMS] in place." (Doc. 233 at 6.) Thus, if TPC's failure-to-vet theory has legs, CNCo would have needed to vet its own counterparty—Grand Famous—and Grand Famous's counterparty—Beikun. Such an attenuated duty to vet would stretch a time charterer's duties beyond the limited scope of responsibility contemplated in Fifth Circuit precedent.

[4] Even if CNCo did have a duty to vet, TPC's theory that CNCo was negligent for failing to investigate Grand Famous' financial stability would still fall short. Negligence requires duty, breach, causation, and damages. *Archer Daniels Midland, Co. v. M/T AMERICAN LIBERTY*, 2021 WL 2621804, at *7 (E.D. La. June 25, 2021) (citing *In Re Mid–S. Towing Co.*, 418 F.3d 526, 531 (5th Cir. 2005)). Setting aside issues of duty, TPC's financial vetting theory also fails on causation. After all, CNCo's failure to vet Grand Famous's financial stability and corporate structure was not a proximate cause of the helmsman turning the Yochow the wrong way.

**SIGNED** at Houston, Texas, on this 8th day of December, 2021.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE